JUDGE BERMAN



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
HAROLD SOTO,

                  Plaintiff,

-v-

THE CITY OF NEW YORK, New York City Police
Department ("NYPD") Undercover Officer 0019,
NYPD Officer JOHN DOE (the name "John Doe"
being fictitious, as the true name and rank is currently
unknown), in their individual capacities,

                  Defendants.
------------------------------------------------------------X

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

INDEX NO. 14-CV-_____

14 CV 5504

        Plaintiff HAROLD SOTO, by his attorney Robert M. Quackenbush of Rankin & Taylor, PLLC, as and for his complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate the plaintiff's rights under the Fourth and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, amended and codified as 42 U.S.C. § 1983.

2. Plaintiff HAROLD SOTO's constitutional rights were violated when narcotics officers of the New York City Police Department ("NYPD") unconstitutionally and without any legal basis arrested Mr. SOTO and caused him to be prosecuted – all upon the fabricated allegation that defendant NYPD Undercover Officer 0019 ("UC 0019") observed Mr. SOTO sell narcotics to his friend while they and another friend ran errands.

3. By reason of defendants' actions, including their unlawful arrest and subsequent initiation of a baseless prosecution, Mr. SOTO was deprived of his rights guaranteed by the Fourth and Fourteenth Amendments.

1

## JURISDICTION AND VENUE

4. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States.

5. This Court has subject matter jurisdiction over federal claims, such as those raised in this case, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

6. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the constitutional violations here at issue occurred within the confines of this judicial district.

7. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

8. Plaintiff HAROLD SOTO is a resident of Bronx County in the State of New York.

9. Defendant CITY OF NEW YORK is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

10. Defendants NYPD UC 0019 and NYPD Officer JOHN DOE (the name John Doe being fictitious, as the true name and rank are currently unknown) (collectively, the "officer-defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

11. Upon information and belief, on June 1, 2013 (the date of the incident here at issue), defendants NYPD UC 0019, NYPD Officer DOE and the other NYPD officials involved in Mr. SOTO's arrest were assigned to the NYPD's Manhattan North Narcotics Division.

12. The officer-defendants are being sued herein in their individual capacities.

13. The true names and ranks of UC 0019 and Officer DOE are not currently known to Mr. SOTO. However, they were, at the time of the incident herein described, employees or agents of the NYPD. Accordingly, the officer-defendants may be entitled to representation in this action by the New York City Law Department ("Law Department") upon their respective requests, pursuant to General Municipal Law § 50-k. The Law Department, then, is hereby put on notice (a) that Mr. SOTO intends to name both of the officer-defendants as defendants in an amended pleading once their true names and ranks becomes known and (b) that the Law Department should immediately begin preparing their respective defense(s) in this action.

14. At all times relevant herein, the officer-defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and had otherwise performed and engaged in conduct incidental to the pursuit and performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD.

15. The officer-defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice and gross disregard for Mr. SOTO's rights.

## STATEMENT OF FACTS

16. The facts alleged herein occurred on June 1, 2013 at approximately 6:15 p.m. in the vicinity of 142 Audobon Avenue in the Washington Heights neighborhood of Manhattan.

17. At approximately the time and place above, Mr. SOTO and two of his close friends were running errands to prepare for a barbeque that evening.

18. At all times relevant herein, Mr. SOTO was in the front passenger seat, with one of his friends sitting in the back seat ("back passenger") and his other friend in the driver's seat ("driver").

19. At the approximate time and place above, the driver parked his vehicle next to the curb, and Mr. SOTO got out of the car and entered a nearby building to borrow an acquaintance's cooler for the barbeque.

20. The driver and the back passenger remained inside the car while Mr. SOTO went to find his acquaintance.

21. After not finding his acquaintance, Mr. SOTO left the building, got back into the front passenger seat of the vehicle, and closed the door.

22. Mere seconds after Mr. SOTO closed the door, officers from the NYPD's Manhattan North Narcotics Division (upon information and belief, including but not limited to Detective Christopher Fleming, Detective Jose Sandobal, and Sergeant Jose Serrano), with guns drawn, approached the car and ordered Mr. SOTO, the driver, and the back passenger to get out.

23. One or more of the officers searched Mr. SOTO's person, without his consent, but found no contraband.

24. Because Mr. SOTO did not have identification with him, the officers told him they would have to take him to the precinct to verify his identity before releasing him.

25. The officers then placed Mr. SOTO in handcuffs and took him to a police stationhouse.

26. While in custody, Mr. SOTO learned that he was going to be charged with selling drugs.

27. About 24 hours after his arrest, Mr. SOTO was brought before the criminal court and was charged with criminal sale of a controlled substance in the third degree, N.Y. Penal Law § 220.39(1).

28. The arrest and charge were based upon the allegation of UC 0019 "that he saw [Mr. SOTO] give [the back passenger] a small object in exchange for money."

29. UC 0019's allegation is completely false, as Mr. SOTO at no time engaged in a drug transaction of any kind.

30. Upon information and belief, Officer DOE was assigned as the "ghost" in the narcotics team's operation. As the "ghost" officer, Officer DOE was responsible for ensuring UC 0019's safety by, *inter alia*, never losing visual contact with UC 0019 and, to the extent possible, observing what UC 0019 was observing. Upon information and belief, because UC 0019 was observing what UC 0019 was observing, and because Mr. SOTO did not engage in a drug transaction with anyone, Officer DOE had reason to believe that no such drug transaction occurred.

31. Despite knowing that Mr. SOTO was innocent of any crime, Officer DOE failed to intervene to prevent the unlawful arrest and prosecution of Mr. SOTO.

32. At arraignment, the prosecution requested cash bail in the amount of fifty thousand dollars. The arraignment court, however, set bail in the amount five hundred dollars instead. Mr. SOTO posted cash bail in the amount of five hundred dollars and was released slightly less than 24 hours after his arrest.

33. Mr. SOTO returned to criminal court approximately three additional times to defend himself against the charge.

34. On December 12, 2013, upon the District Attorney's motion, the criminal court dismissed the charge against Mr. SOTO.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
*(Against the Officer-Defendants)*

35. Mr. SOTO incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

36. The officer-defendants, under color of state law, subjected Mr. SOTO to the above-described acts and omissions, thereby depriving Mr. SOTO of his rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, including but not limited to deprivation of the following constitutional rights:

   a) freedom from unreasonable seizure of his person, including but not limited to false arrest and false imprisonment, against UC 0019;

   b) freedom from having a police officer refuse to intervene in constitutional violations occurring in his immediate presence, against Officer DOE;

   c) freedom from the lodging of false charges against him by police officers, against UC 0019;

   d) freedom from having police officers fabricate evidence against him, against UC 0019; and

   e) freedom from malicious prosecution, against UC 0019.

37. The officer-defendants' deprivation of Mr. SOTO's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
*(Against THE CITY OF NEW YORK)*

38. Mr. SOTO incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

39. All of the acts and omissions by the officer-defendants and the other police officers involved with Mr. SOTO's arrest were carried out pursuant to overlapping policies and practices of the

CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

40. The CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the officer-defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

41. The acts complained of were carried out by the aforementioned officer-defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

42. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include but are not limited to arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas).

43. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

    a. People v. Alicea, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant convicted of 10 felony counts of filing a false document and one misdemeanor count of official misconduct, for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly showed that the two arrestees had no contact; in response to the indictment, Manhattan District Attorney Cy Vance stated "We rightfully trust our police officers to report their activities truthfully. Those who do not erode the public's trust in law enforcement… To falsely accuse anyone of a drug sale is not only unacceptable, it is a crime.");

    b. People v. Arbeedy, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's

7

practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

c. Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

d. Long v. City of New York, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer convicted of falsifying police records which covered up his assault of a demonstrator);

e. Lin v. City of New York, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence);[1]

f. Colon v. City of New York, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust narcotics operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

---

[1] For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

    g. <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest).[2]

44. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

    a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[3]

    b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[4]

    c. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, <u>to wit</u>, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "Next

---

[2] For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[3] Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[4] Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at* http://www.nydailynews.com/ny_local/2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (*sic*) then."[5]

d. The New York Daily News obtained and published two (2) internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[6]

e. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[7]

f. In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one (1) officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[8]

g. In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[9]

h. Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor

---

[5] *Id.*

[6] James Fanelli, *Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say*, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

[7] Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_m7iRAd9b4E9alYPuGvy5OO.

[8] Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

[9] Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya__deputy.html.

performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[10] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."[11]

i. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[12]

j. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.
>
> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

---

[10] William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

[11] Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[12] *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

>Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[13]

45. The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, then-Commissioner Kelly.

46. The actions of the officer-defendants and other officers involved in Mr. SOTO's arrest resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which were implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They did so with the knowledge and approval of their supervisors, commanders and then-Commissioner Kelly who all: (i) tacitly accepted and encouraged a code of silence wherein police officers refused to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encouraged and, in the absence of video evidence blatantly exposing the officers' perjury, failed to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations

---

[13] Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

47. All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraph "36" above.

48. The CITY knew or should have known that the acts alleged herein would deprive Mr. SOTO of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

49. The CITY is directly liable and responsible for the acts of the officer-defendants and the other officers involved in Mr. SOTO's arrest because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

50. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including then-Commissioner Kelly, did not take steps to terminate these policies, practices and/or customs, did not discipline individuals who engaged in such policies, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

51. The aforementioned CITY practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police

misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, UC 0019, Officer DOE, and the rest of the narcotics team arrested Mr. SOTO without probable cause and then fabricated and swore to a false story to cover up their blatant violations of Mr. SOTO's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, the officers (including but not limited to Officer DOE) failed to intervene in or report UC 0019's violation of Mr. SOTO's rights.

52. Mr. SOTO's injuries were a direct and proximate result of the CITY and the NYPD's wrongful <u>de facto</u> policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers, including but not limited to members of the NYPD's Manhattan North Narcotics Division.

## JURY DEMAND

53. Mr. SOTO demands a trial by jury in this action on each and every one of his damage claims.

*WHEREFORE*, Mr. SOTO demands judgment against the defendants individually and jointly and prays for relief as follows:

   a. That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

   b. That he be awarded punitive damages against UC 0019 and Officer DOE; and

   c. That he be compensated for attorneys' fees and the costs and disbursements of this action; and

   d. For such other further and different relief as to the Court may seem just and proper.

///

///

14

Dated:   New York, New York
         July 22, 2014

                                                                      Respectfully submitted,

By: *[signature]*
        Robert M. Quackenbush
        Rankin & Taylor, PLLC
        *Attorneys for the Plaintiff*
        11 Park Place, Suite 914
        New York, New York 10007
        t: 212-226-4507